**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-1664

ESTATE OF RYAN RONQUILLO, by and through
APRIL SANCHEZ as personal representative

        Plaintiff,

v.

CITY AND COUNTY OF DENVER;
ERNEST SANDOVAL, individually and in his official capacity;
JEFFREY DIMANNA, individually and in his official capacity;
JOEL BELL, individually and in his official capacity;
LUKE INGERSOLL, individually and in his official capacity;
BRIAN MARSHALL, individually and in his official capacity;
DANIEL WHITE, individually and in his official capacity;
TONI TRUJILLO, individually and in her official capacity;

        Defendants.

---

**CIVIL RIGHTS COMPLAINT WITH REQUEST FOR TRIAL BY JURY**

---

Plaintiff Estate of Ryan Ronquillo, by and through counsel, HOLLAND, HOLLAND EDWARDS & GROSSMAN, P.C., complains against Defendants and request a trial by jury as follows:

## I.     INTRODUCTION

1. Ryan Ronquillo was killed on July 2, 2014, as a result of grossly excessive deadly force and deliberately indifferent police practices by the City and County of Denver.

2.      Just 20 years old at the time, Mr. Ronquillo was unarmed when he was shot to death by police officers in the parking lot of a funeral home, a funeral he was known by many of the involved officers to be attending for the death of his close friend.

3.      This killing began with multiple officers assaulting an unarmed and non-violent Ryan Ronquillo outside the funeral home, after police had been surreptitiously pursuing him for hours for a mere suspected property crime in connection with a stolen car.

4.      From the moment they came on scene, officers did not clearly identify themselves as law enforcement or afford Mr. Ronquillo the slightest opportunity to peacefully surrender.

5.      Instead, despite no preceding threat, they assaulted him while he was still in his vehicle, punching him on his head repeatedly, which left several non-gun shot related facial injuries found during the autopsy.

6.      Video surveillance, **Exhibit A,** hand filed with the Court's Clerk, and incorporated herein by this reference, shows Mr. Ronquillo parking in front of the funeral home, police quickly closing in, and then immediately assaulting him in his car.

7.      When Mr. Ronquillo attempted to escape this unprovoked assault in self-defense he made accidental vehicle contact with one of the officers.

8.      Despite the fact that he was unarmed and not posing a deadly threat to either officers or civilians at the time with force other than potentially his vehicle, four of the Defendants unified response was to shoot at the moving vehicle, a deadly force practice that was both grossly excessive and permitted by Denver's deliberately indifferent training and policies at the time.

9.      Four officers fired a total of eleven bullets at Mr. Ronquillo, three of which hit his head and neck.

10.     Although this shooting was preceded and caused by an unjustified assault on Ryan Ronquillo by these officers, Denver has since covered up what happened by purposely falsely stating, including most recently in February 2016 through Denver Police Chief White, that as the police approached, and before they made any contact with him, Ryan Ronquillo backed up at a high rate of speed.

## II.     JURISDICTION AND VENUE

11.     This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. §1983 and 42 U.S.C. § 1988. The Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

12.     This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

## III.     PARTIES

13.     At all times relevant hereto, the decedent, Ryan Ronquillo, was a citizen of the United States and a resident of the State of Colorado.

14.     At all times relevant hereto, April Sanchez, the duly appointed personal representative of the Plaintiff Estate of Ryan Ronquillo, opened in the City and County of Denver, was the mother of Ryan Ronquillo and a citizen of the United States and resident of the State of Colorado.

15.    Defendant City and County of Denver ("Denver") is a Colorado municipal corporation and county.

16.    Defendant Denver's Department of Safety is responsible for the oversight, supervision, and training of the Denver Police Department, headed by Chief Robert White as the final delegated policy maker for the Denver Police Department and the Denver Sheriff's Department.

17.    At all times relevant hereto, Defendant Ernest Sandoval, a Denver police officer, was a citizen of the United States and a resident of Colorado, and was acting under color of state law in his capacity as a law enforcement officer employed by the Denver Police Department.

18.    At all times relevant hereto, Defendant Jeffrey DiManna was a citizen of the United States and a resident of Colorado, and was acting under color of state law in his capacity as a law enforcement officer employed by the Denver Police Department.

19.    At all times relevant hereto, Defendant Joel Bell, a sergeant in the Denver Police Department Fugitive Unit, was a citizen of the United States and a resident of Colorado and was acting under color of state law in his capacity as a law enforcement officer employed by the Denver Police Department.

20.    At all times relevant hereto, Defendant Luke Ingersoll was a citizen of the United States and a resident of Colorado, and was acting under color of state law in in his capacity as a deputy sheriff employed by the Jefferson County Colorado Sheriff's Department.

21.    At all times relevant hereto, Defendant Brian Marshall was a citizen of the United States and a resident of Colorado, and was acting under color of state law in his capacity as a law enforcement officer employed by the Denver Police Department.

4

22.    At all times relevant hereto, Defendant Daniel White was a citizen of the United States and a resident of Colorado, and was acting under color of state law in his capacity as a law enforcement officer employed by the Denver Police Department.

23.    At all times relevant hereto, Defendant Toni Trujillo was a citizen of the United States and a resident of Colorado, and was acting under color of state law in her capacity as a law enforcement officer employed by the Denver Police Department.

## IV.    STATEMENT OF FACTS

24.    On July 2, 2014, Ryan Ronquillo was attending a funeral for his close friend at the Romero Funeral Home, located at 4750 Tejon Street in Denver, Colorado.

25.    Mr. Ronquillo had been at the funeral before he was killed, to the observation of many witnesses, including at least one related to involved Denver law enforcement.

26.    He was shot to death outside the funeral home in the parking lot by Denver police officers reportedly at about 6 p.m. on July 2, 2014.

27.    Throughout the service, witnesses grieved with Mr. Ronquillo in and outside of the Funeral Home, as early as 4:15pm, where many saw him mourning the death of his friend.

28.    According to police reports, Safe Streets Fugitive Task Force began tracking Mr. Ronquillo's location by GPS coordinates from his phone at approximately 2:45pm.

29.    Mr. Ronquillo was a non-violent suspect who was being pursued by police officers and their task forces for arrest warrants relating to property crimes.

30.    At least several of the involved officers, including Defendants Sandoval, Marshall, DiManna and White, admittedly knew that Mr. Ronquillo was attending a funeral at the time of his arrest and killing.

31.    Before the shooting, this specific funeral was specifically discussed with the Denver Gang Unit by Detective Adam Lucero, who stated he received multiple calls about it both from a member of the public and from "District 1 Officer Blanc".

32.    Officer Sandoval admitted that he "learned over the radio that Ronquillo had backed his vehicle into a parking spot *at a funeral home* and they were going to attempt to arrest him there." (Emphasis supplied.)

33.    Defendant White acknowledged knowing that he learned before these events that there "was a viewing for someone who had killed himself."

34.    Defendant Marshall admitted to Denver Police Captain Saunier that, prior thereto, he also knew from Detective Lucero that a funeral was taking place for someone who had killed himself and "the viewing was at Romero's Funeral Home."

35.    Defendant DiManna admits that Detective Lucero advised the "nightshift gang unit" that a funeral for someone who had committed suicide "was taking place at Romero's."

36.    Just before he was killed, Mr. Ronquillo returned to the funeral and pulled into a parking space in the funeral home parking lot, clearly planning to get out of his car and go back inside.

37.    Although he was quickly and easily located, officers recklessly decided to effectuate his arrest at a funeral while he was still in his car.

38.    At the time of his arrest, there were no exigent circumstances and Mr. Ronquillo posed no threat to anyone.

6

39.     Despite no pressing, let alone exigent, circumstances, the officers chose not to wait until Mr. Ronquillo was out of car and no longer potentially vehicle mobile in order to safely apprehend him with the large number of officers present.

40.     This decision was contrary to the preceding "arrest plan" "to land him" without his being in the vehicle he was in driving.

41.     Thus, Defendant Trujillo explained regarding the original arrest plan: "The plan was to arrest Ronquillo in a stationary spot so as not to engage him in a car chase.  The plan was to have undercover Detectives keep an eye on Ronquillo and follow him if necessary, until he landed at a place where the uniformed officers could safely arrest him."

42.     This plan was unjustifiably and unreasonably abandoned, as Mr. Ronquillo had not yet completed becoming landed or stationary by turning the engine off.

43.     Despite no exigent circumstances, the officers did not choose anywhere near the safest course of action or follow proper procedures for a high-risk felony stop.

44.     Instead, these Defendants recklessly chose the most dangerous means of apprehension possible for all involved, including Mr. Ronquillo, themselves and the public.

45.     After Mr. Ronquillo pulled into a funeral parking lot space between two cars, two SUVs came dangerously "flying in", according to eye-witnesses.

46.     Here is photo of Mr. Ronquillo's parked car in the Romero Funeral Home parking space just before the police wedged him in to the front:

7



47.    There were many witnesses to this assault and killing, as people came out from the funeral to see what was happening.

48.    According to witness Mallory Morales, the police came in without sirens or warning, and with no regard for the people and children around, who were in danger of being "almost run. . .over."

49.    Witness Elvira Galvan reported: she saw a big black truck "coming at us really fast and thought we were going to be run over and had to get of the way really fast to avoid it."

50.    This unmarked vehicle was a Ford Expedition driven by DPD Detective Defendant Ingersoll.

51.    The second of these SUV's was a gray unmarked silver Lexus SUV driven by Defendant Bell.

52.    Witness Tina Trujillo also stated that she was almost hit by a moving police vehicle.

53.    Witness Duran stated that these unmarked vehicles "almost hit two little girls."

54. Witness Luevano stated one vehicle "almost ran her over" and she was forced to jump out of the way.

55. Officers placed their vehicles in a position to wedge Ronquillo into his parking space with their cars, before he was able to turn off or exit the car to return to the funeral.

56. This is a picture of the wedge they created:



57. In this wedge, Defendant Ingersoll's unmarked black Ford Expedition formed the left part of the wedge visible in the picture, while Defendant Bell's unmarked Lexus formed the right part.

58. After making bumper contact with Ronquillo's parked car, Defendant Ingersoll exited his vehicle and immediately ran up to the front passenger window.

59. At the same time, Defendant Bell exited his vehicle and ran up to the front driver side window of Mr. Ronquillo's parked car.

60.    Simultaneously, Defendants DiManna and Sandoval arrived on scene in a police car, having followed immediately behind Defendant Ingersoll's unmarked Expedition into the funeral home parking lot.

61.    Defendant Sandoval exited the passenger's side of this vehicle and immediately ran to the driver's side front window of Mr. Ronquillo's parked car.

62.    Here are a couple of stills from **Exhibit A** video showing some of the officers running right up to Mr. Ronquillo's parked car:





63.    Defendant DiManna exited the driver's side of the vehicle, ran around the car parked immediately to the south of Ronquillo's car (which was facing east towards the funeral home) and took a position behind and to the passenger's side of Ronquillo's car.

64.    Defendant White, who was driving alone following the DiManna/Sandoval vehicle, likewise ran to the back of Ronquillo's parked car, positioning himself "to the right rear side of him" in an effort to stay out of the way in case the vehicle moved backwards.

65.    Simultaneously, Defendant Trujillo, driving her own unmarked Ford Fusion, recklessly parked in the middle of Tejon street (the street immediately behind and to the west of Ronquillo's east-facing parked car), rather than entirely blocking Mr. Ronquillo's car from directly behind.

66.    Defendant Trujillo exited her car and also recklessly approached the rear of Ronquillo's car.

67.    According to a number of witnesses, many of the officers did not clearly identify themselves as law enforcement and a significant number were not in uniform.

68.    Some witnesses believed they were witnessing a high-speed chase and a fight was possibly about to happen.

69.    Witnesses including Gomez, Morales, Galvan, Quintana, Jaszczyk, and Gonzales have variously reported: "They didn't call out police"; "You wouldn't think they were police officers"; "I did not hear anyone say they were police" and; "I didn't hear them yell anything like that."

70.    Mr. Ronquillo was unaware that he was being followed for hours by police units from multiple jurisdictions for property crimes.

11

71.    After wedging in his car, the officers did not give Mr. Ronquillo any chance to surrender peacefully.

72.    No officer presented a badge, according to several witnesses, including Bustamente, Galvan, Gomez, Jaszczyk and Gonazales.

73.    A number of witnesses report they never heard police give any commands or instructions that would afford Mr. Ronquillo a chance to surrender peacefully.

74.    Witness Gonzales reported that Mr. Ronquillo was never given a chance to surrender, stating: "They didn't say 'put your hands up', or 'surrender', or anything like that. It was crazy."

75.    Defendant Trujillo also admitted that Ronquillo was not given a chance to surrender, answering "No" (under oath) when asked if she gave him or heard "other officers give him any commands."

76.    After not giving Mr. Ronquillo a chance to surrender, the officers assaulted him without the slightest shred of justification, in a flagrantly excessive use of force.

77.    This highly aggressive assault of the unarmed Ryan Ronquillo can be seen in the attached **Exhibit A** video, which shows multiple officers attacking him, without affording him any reasonable opportunity to first peacefully surrender and obey commands to get out of his car (if, *arguendo* only, any such were given), where his arrest could have been safely effectuated without such excessive force.

78.    No officer reports any preceding physical violence or threats by Mr. Ronquillo that would justify the use of any hands-on physical force.

79. He was in fact doing nothing aggressive and not an imminent threat to any other person.

80. At the time law enforcement decided to assault Mr. Ronquillo, he was not actively resisting arrest or attempting to evade arrest by flight.

81. At the time he was assaulted and killed, Ronquillo was unarmed.

82. Denver Police Department Commander Matt Murray admitted in the media that there was no evidence that Mr. Ronquillo was armed or violent at the time he was attacked.

83. Law enforcement also had no reasonable expectation that Mr. Ronquillo was about to become an imminent threat to anyone.

84. Rather, at least some of these Defendants and their police colleagues, had every reason to expect that having just parked, Mr. Ronquillo intended to voluntarily get out his car to return to the funeral for his friend, which would have allowed his safe arrest outside without any potential danger from a moving vehicle.

85. The **Exhibit A** video shows multiple officers running up to the passenger and driver windows and a flurry of activity.

86. According to his sworn statement, Defendant Sandoval admitted that he pounded Ronquillo in the face repeatedly through his car window.

87. Specifically, Defendant Sandoval reported that, he "ran up to the driver's side of Mr. Ronquillo's vehicle", "ripped the suspect's shirt collar area", and pulled some type of Broncos key lanyard from around Ronquillo's neck.

13

88.    According to a police summary, Defendant Sandoval "**punched [Mr. Ronquillo] several times in the head"**, and reported that these multiple punching actions "had no effect." (Emphasis supplied.)

89.    In his own videoed words, Defendant Sandoval says: "I struck him a couple times in the face. . . it didn't work at all."

90.    From these assaults, in addition to bullet holes, the Coroner found multiple non gun shot related injuries and abrasions on and about Mr. Ronquillo's head and face.

91.    One of these punches caused a laceration to his mouth:



92.    Defendant Sandoval was assisted in carrying out this concerted unprovoked brutal assault by multiple officers, including but not limited to Defendants Bell and Ingersoll, who were all aggressively hitting him, grabbing at Mr. Ronquillo, or smashing his car windows with various weapons, and trying to forcibly remove him from his car.

93.    Defendant Sandoval further reported that another officer, later established as Defendant Ingersoll, "broke out the passenger side window" of Ronquillo's car.

94.    Defendant Ingersoll also grabbed Ryan Ronquillo's hand and/or arm before he drove the car backward.

95.    Defendant Ingersoll also admits that he attempted to break or did break out the car windows.

96.    Defendant Daniel White conceded that the officers were trying to break out Ronquillo's window and were trying to "grab" him from the vehicle.

97.    Defendant Trujillo, the first shooter, has stated that she observed officers trying to break out the window of the black Honda.

98.    Defendant Trujillo was present during this assault by her fellow officers and along with all the officers present, including several named Defendants, did nothing to intervene to stop it, despite opportunity.

99.    Multiple non-police eye witnesses also report that the attacking officers were hitting Ryan Ronquillo, kicking at him, and attempting to break out the car windows using their weapons, including batons, flashlights, gun butts, and clubs.

100.    Witnesses Morales saw an officer, believed to be Defendant Sandoval based on his herein quoted admissions, "hitting Ryan with his fists repeatedly."

101.    According to witness Morales, Mr. Ronquillo was trying to move towards the passenger side during this assault.

102.    Witnesses Bustamente, Morales and Jaszcyk state that one officer even reached his leg through the window and appeared to be trying to kick Ronquillo's face.

103.    No clear commands were given during this group assault.

104.    Further, even if any such orders were given during this assault, which they were not, Mr. Ronquillo was not given any reasonable or sufficient opportunity to comply, as several officers were simultaneously physically assaulting him, which prevented the possibility of such compliance.

105.    Mr. Ronquillo foreseeably tried to exercise his right of self-defense to escape this grossly excessive and illegal assault by law enforcement.

106.    At the time they began the assault, officers knew Mr. Ronquillo could not drive forward because they made bumper contact with his car when they wedged him in, as admitted by law enforcement and shown in the photos and video footage.

107.    However, as part of their reckless decision to assault him, the officers also recklessly did not plan to completely block the backwards path of Ronquillo's vehicle, despite having the opportunity and physical means to do so, using Defendant Trujillo's Ford Fusion vehicle that arrived on scene at the same time the officers "wedged" the car to block his forward path.

108.    Mr. Ronquillo foreseeably backed up his vehicle in an effort to escape, unaware that Defendant Trujillo was approaching his car from behind as officers were assaulting him.

109.    While backing up the vehicle, Ronquillo made accidental injurious physical contact with the recklessly positioned Defendant Trujillo.

110.    Continuing backwards, Mr. Ronquillo's car also made contact with Defendant Trujillo's vehicle—still parked and now unoccupied in the middle of Tejon Street.

111.    Several of the Defendants moved to surround Mr. Ronquillo's car from the sides and the rear, his forward path still clearly blocked by the vehicle wedge.

112.    Defendant Marshall, who had arrived at the scene moments after the other officers, first took up a position in front of Mr. Ronquillo's car immediately after it had backed up into Defendant Trujillo's car.

113.    Defendant Marshall apparently recognized the recklessness of his own positioning, and, before shooting at Mr. Ronquillo, retreated to a more protected position five to ten feet away from the front driver's side bumper of Mr. Ronquillo's car.

114.    As Mr. Ronquillo's car moved backwards, Defendant DiManna also retreated to a position on the passenger side of Mr. Ronquillo's car, opposite of Defendant Marshall such that Defendant Marshall was allegedly worried that he and DiManna were in each other's line of fire, but not in danger from the vehicle.

115.    Defendant White also backed up to a safe position on the passenger side of Mr. Ronquillo's car.

116.    Collectively, the officers had Mr. Ronquillo's car completely surrounded: the Ingersoll/Bell car wedge and other parked cars blocked Mr. Ronquillo's forward path; Defendant Trujillo, with weapon drawn, was behind Mr. Ronquillo's car; Defendant Marshall, weapon drawn, was on the front driver's side of Mr. Ronquillo's car, and; Defendants DiManna and White, weapons drawn, were on the passenger side.

117.    As Defendant Marshall described to investigators the moments before the shooting started: "We had – essentially we had an officer perimeter around the suspect car and

tactically not the best, but the way it was such a dynamic situation, that's what occurred and we had to work with it."

118.    At or around the time that Mr. Ronquillo put, or was putting his car in gear to move forward, the Defendant officers opened fire.

119.    Defendant Trujillo fired first, followed by Defendants DiManna, Marshall, and White.

120.    Several of the shooting officers appear to have recklessly engaged in "contagious" or "contagion" shootings, without independent assessments justifying the need for deadly force, pursuant to Denver's deliberately indifferent policies governing shooting at moving vehicles.

121.    Defendants Trujillo, DiManna, Marshall, and White fired at least eleven rounds.

122.    According to the Denver Coroner: "Ryan Ronquillo, a 20-year-old male, died as a result of gunshot wounds of the head and neck.  The manner of death is homicide."

123.    More particularly, the three bullets to the head and neck were all fatal.

124.    According to the Police Department's ballistic analysis, Defendant Marshall fired all three of these bullets.

125.    Thus, while all four of these police shooters were actively attempting to kill Ronquillo, DPD Detective Bisgard reviewed the ballistics report by DPD's forensic scientist, Zachary Kotas, and concluded that the three fatal bullets recovered from Ryan Ronquillo's head "were fired by Officer Marshall's .45 caliber weapon."

126.    In any case, these four shooting officers all knew that their multiple rounds of bullets aimed at the head and neck and body were virtually certain to cause the death of Mr. Ronquillo.

127. It was constitutionally unreasonable for these defendants to use deadly force under the totality of the circumstances.

128. At the time he was shot and killed, Mr. Ronquillo did not pose an actual and imminent threat to the lives of any officers or civilians present at the scene.

129. In backing up, Mr. Ronquillo was not targeting the car at any officer, but rather was positioning his vehicle in the natural direction of the road to escape the continuing assault.

130. When he pulled forward, Defendant Trujillo was not directly in front of his vehicle, but was located ahead of the vehicle *to the right* of the passenger side.

131. Defendant Trujillo and/or other officers recklessly did not get themselves out of the way of the vehicle to avoid any danger of being contacted by the vehicle, despite reasonable opportunities to do so.

132. Further, it appears that Defendant Trujillo was moving toward the car with her gun drawn in the moments before she first shot.

133. These officers also had no reason to believe that just letting Mr. Ronquillo drive away would pose a threat of serious physical harm to the officers or others, if it were even possible given the position of surrounding cars and the wedge.

134. Prior to his fatal attempted arrest, Mr. Ronquillo never displayed any violence nor did he display any tendency to drive dangerously throughout the day.

135. In fact, by their own accounts, officers were peacefully following him for hours.

136. They abandoned professional judgment and impulsively tired of their efforts to "land" him, determining instead to just launch an unconstitutional physical assault.

137.    Prior to any perceived threat by Mr. Ronquillo's vehicle, the officers own reckless conduct in carrying out his arrest created any need to use such deadly force.

138.    Evidencing deliberate indifference in training and supervision in a recurring situation, the covert operation and planned arrest of Mr. Ronquillo was carried out without any operational plan or any mandatory approvals for such a plan by DPD commanders under City policies governing covert operations.

139.    Defendant Bell, who has a history of excessive force complaints, describes himself as the one in charge of this covert activity.

140.    This covert operation, directed by Defendant Bell and/or by Defendant Ingersoll and/or Sergeant Gavito, was carried out recklessly by tactical squads at a funeral home, endangering many innocent bystanders in blatant violation of DPD policies, which mandate that the safety of the "general public, and suspects(s) is of paramount importance" when carrying out covert operations.

141.    Denver's Independent Monitor, Nick Mitchell, found that Ronquillo's apprehension in a parking lot full of people violated such DPD Department policies.

142.    Prior to assaulting and then killing Mr. Ronquillo for mere property crimes, these Defendants all recklessly decided not to follow any high-risk felony stop procedures.

143.    They did not use a bullhorn or any other similar means to announce that they were police and he was under arrest.

144.    They did not give Mr. Ronquillo any reasonable or sufficient chance to peacefully surrender.

20

145.    They did not surround Mr. Ronquillo, with guns drawn, from safe and covered positions, and order him to get out of his car from a distance.

146.    They recklessly did not block all potential escape routes behind his parked vehicle while taking up safe defensive positions, despite having overwhelming manpower, opportunity and capacity to do so.

147.    Instead, the officers commenced this process by unconstitutionally attacking Mr. Ronquillo and thereby intentionally and recklessly decided, contrary to his constitutional right to be free from unreasonable seizures, not to afford him any reasonable opportunity to surrender or comply with any such orders.

148.    Police are afforded no constitutional justification for killing someone who is justifiably defending himself by attempting to get away from an illegal violent assault by police sworn to uphold the law.

149.    No policeman ever contacted Ryan Ronquillo's parents to tell them their son was dead; they first learned about it from news media accounts.

**Denver's Cover-up And Ratification Of This Wrongful Killing**

150.    The City of Denver ratified, covered up, and condoned the killing of Ryan Ronquillo.

151.    On February 16, 2016, Chief White announced that the Denver Police Department had determined that the four police officers used appropriate force and tactics consistent with department policies when they shot and killed Ryan Ronquillo in a crowded funeral home parking lot in July 2014.

21

152.    Chief White even stated that the officers made: "the best strategic decision possible" on where to stop Ronquillo, and, "all the decisions the officers made given what they were confronted with and given what they knew at the time were reasonable at the time they made those decisions."

153.    In an August 8, 2014 report, Denver's District attorney also determined that the killing of Ryan Ronquillo was a "reasonable" shooting, as essentially always occurs when his office is asked to investigate a Denver Police Department officer-involved shooting.

154.    In so doing, the District Attorney and Denver Police Chief White both consciously chose to cover up the actual assault of Mr. Ronquillo that occurred right before he was killed.

155.    Thus, neither the Chief of Police nor the District Attorney makes any mention of Defendant Sandoval's admissions that he repeatedly punched Ryan Ronquillo in the head before he began backing up.

156.    DA Morrisey falsely stated in his report that the Defendant officers gave Ryan Ronquillo "repeated commands to stop and repeated opportunities to surrender" despite the sworn statement of Officer Trujillo and other eyewitnesses stating otherwise.

157.    Chief White further falsely reported in February 2016, both in a press release and in a letter to April Sanchez, that this killing was justified because Ryan Ronquillo tried to flee as soon as police approached, writing in his own words that: "***As uniformed officers approached***, Mr. Ronquillo stepped on the gas and advanced in reverse at a high rate of speed." (Emphases supplied.)

22

158. According to a DPD summary of Defendant Sandoval's statements, however, it was only *after* Sandoval punched Ronquillo several times that "the **"Honda *then* backed up"** for the first time and Officer Sandoval let go. (Emphases supplied.)

159. Chief White thus knew of Defendant Sandoval's contradicting account at the time he made the false statements regarding the events prior to the shooting.

160. DA Morrisey likewise made no mention of these punching admissions by Defendant Sandoval in his blessing of this police killing resulting in no criminal charges.

161. Thus, despite video footage and officer reports, to divert from Defendants liability, Denver has persisted in its cover up, designed to cause the public to falsely perceive that Ryan Ronquillo took off as the officers approached him, ignored officer commands to surrender, and fled in his vehicle hitting an officer in his path, rather than backing his car up after suffering the violent assault admitted to by the officers themselves as described herein.

162. Though all of this was unquestionably known to Chief White, acting as final decision maker for Denver, he also has refused to recant this intentionally misleading public statement, thereby actively continuing this ongoing cover-up to the present time.

163. Further, in an effort to defuse public criticism of its egregious handling of Mr. Ronquillo's arrest and his unjustified killing, the City has even tried to make it appear that the police did not understand that Ryan Ronquillo was attending a funeral.

164. Yet as aforealleged, several of these Defendants knew they were acting right outside a funeral home where a funeral was occurring.

165. As referenced above, Defendant Sandoval stated during his interview with investigators that a message was aired over the dispatch radio that he knew this was happening at a funeral home.

166. As also referenced above, Defendant Marshall, one of the shooters, told investigators from the District Attorney's office in a sworn statement: "Plus I knew from roll call there was a funeral going on here as well."

167. At least one officer, anticipating the forthcoming arrest, was reportedly concerned that there was going to be violence at the funeral home that could threaten his own family members.

168. This officer, whose full name is currently unknown, was described in a police videotaped statement by witness Chris Gomez as: "really built, [with] blond hair [and] sleeved tattoos."

169. More particularly, at approximately 5 p.m., roughly an hour before the shooting, Christopher Gomez told Detective Bisgard that an Officer married to Debbie Luevano told: "Debbie and her father, Tony, to leave the funeral home because something was about to go down. This happened at approximately 5:00 p.m., and they only stayed for approximately 10 minutes."

170. According to this Mr. Gomez's witness statement: "that officer knew what was going to happen so he warned them."

171. Mr. Gomez also reported in this statement that "he believed the Officer sent his wife in there to make sure" Ryan Ronquillo "was inside."

24

172.    Mr. Gomez added that the Officer told him he was "sorry for his loss" and then reiterated that, "he told his wife to get out of there because something like that would happen."

173.    It thus appears that this event may well have actually been planned to occur at the funeral home.

<strong>Facts Relating to Entity Liability</strong>

174.    At all times relevant hereto, Denver had deliberately indifferent policies, customs, habits, training and procedures which permitted police to shoot at persons in or driving moving vehicles even where, as here, no other deadly force was being used against the officers or persons present.

175.    Denver's Office of Independent Monitor recently prepared the following partial timeline of DPD shootings into moving vehicles:



Figure 1.1. Timeline of DPD Shootings into Moving Vehicles, 2007–Present

176.    Defendant Jeffrey DiManna was personally involved in three moving vehicle related shooting cases in six months, including this case.

177.    At all times relevant hereto, despite a long and continuing history of such shootings, Denver maintained deliberately indifferent policies, practices, training and procedures that were seriously outdated and not in conformity with international police practice.

178.    As early as 2006, the International Association of Chiefs of Police (IACP) Model Policy relating to shooting at moving vehicles stated:

> Firearms shall not be discharged at a moving vehicle unless a person in the vehicle is immediately threatening the officer or another person with deadly force by means other than the vehicle. The moving vehicle itself shall not presumptively constitute a threat that justifies an officer's use of deadly force. An officer threatened by an oncoming vehicle *shall move out of its path* instead of discharging a firearm at it or any of its occupants.

179.    At all times relevant hereto, with deliberate indifference, Denver policies and procedures allowed guns to be fired at moving or fleeing vehicles when no deadly force was being used against the police or other persons present by means other than the force of a moving vehicle, contrary to well-established accepted police practices.

180.    At all times relevant hereto, with deliberate indifference, Denver policies did not require police officers to exercise good judgment and not move into or remain in the path of moving cars, nor require that they attempt to move to a position of safety rather than shooting at the vehicle or its occupants.

181.    After these events, as part of Denver's longstanding pattern, habit and custom of tolerating, permitting, ratifying, encouraging and permitting officers to shoot at moving vehicles even when no deadly force is being used against the police officer or another person present by means other than the moving vehicle, Denver police officers Greene and Jordan killed Jessica

26

Hernandez, an unarmed teenager, allegedly in possession of a stolen car, by firing into her vehicle.

182.    It was not until June 2015, after this unconstitutional killing and others, that Denver Police Department updated its deliberately indifferent policies with respect to discharging firearms at moving vehicles.

183.    DPD's Operations Manual now states: "Firearms shall not be discharged at a moving or fleeing vehicle unless deadly force is being used against the police officer or another person present by means other than the moving vehicle." OMS 105.05(5)(a).

184.    As the obvious alternative, it provides: "Officers shall exercise good judgment and not move into or remain in the path of a moving vehicle or any occupant. An officer in the path of a vehicle shall attempt to move to a position of safety rather than discharging a firearm at the vehicle or any of the occupants." OMS 105.05(5)(b).

185.    Before June 2015, Denver maintained deliberately indifferent policies and training with respect to police officers shooting at moving vehicles and killing people, and instead unconstitutionally turned a blind eye to this obviously recurring problem resulting in additional similar fatal police shootings after this one.

186.    The acts and omissions of these individual Defendants were also engaged in pursuant to the custom, policy, training and practice of the City and County of Denver and the Denver Department of Safety, which has frequently encouraged, condoned, tolerated, and ratified the use of excessive force by law enforcement officers in this City resulting in a veritable litany of death and severe physical injuries to the public.

187.    The Denver Department of Safety consists of both the Denver Police Department and the Denver Sheriff's Office. Law enforcement officials from both branches of the Department of Safety have repeatedly and unlawfully used excessive force against citizens.

188.    Denver law enforcement officers have engaged in a persistent practice of law enforcement misconduct, and the officials responsible for assuring that such misconduct does not occur have consistently failed to properly train, supervise, and discipline individual officers who have engaged in such misconduct.

189.    This culture and environment of brutality and the lack of training, supervision, and discipline of law enforcement officers is evidenced by, among other things, the sheer volume of lawsuits filed against and/or legal settlements with Denver law enforcement alleging excessive force, the involvement of dozens of different law enforcement officials in those lawsuits, and the repeated involvement of the same officers in multiple lawsuits.

190.    For example, Denver City Attorney David Fine reported to the Denver City Council in September of 2010 that the city of Denver has spent nearly $6.2 million since 2004 to settle lawsuits involving police officers, and nearly all of the payouts were for allegations of excessive force. These statistics do not even include lawsuits against the City and County of Denver arising out of Sheriff's Department conduct.

191.    This figure has gone much higher since the payment of the six million dollar Marvin Booker judgment for his homicide in the Denver jail at the hands of multiple individual deputy sheriffs, and the payment of 3.25 million dollars to Jamal Hunter who was tortured, attacked and had his genitals scalded when hot water was thrown on his groin.

192.    Arising out of an incident on January 11, 2011, Denver settled an excessive force lawsuit with Alexander Landau for $795,000, who was beaten with the officers' fists, radio, and a flashlight in a brutal racially motivated assault.

193.    Arising out of an incident in July 2009, the City paid $360,000 to Ana Ortega and three other women who were assaulted with mace and hands-on excessive force outside of the Denver Diner. Officers who were repeat players in these excessive force incidents were allowed to continue working at the Denver police department.

194.    Earlier than these recent cases, and the shooting death of Jessica Hernandez similar to the facts here, between January and June of 2010, seventeen Denver police officers were associated with excessive force complaints, a higher ratio per law enforcement officer than any other U.S. City.[1]

195.    In 2008, the City of Denver and Denver Health paid a combined $7 million to the family of Emily Rae Rice, who had died while in custody of the Denver Sheriff's Department due to the deliberately indifferent conduct by Defendants.

196.    Also in 2008, Denver paid $150,000 to Timothy Thomason, who was deprived of medical care while in the city jail.[2]

197.    Denver has a long history of tolerating and ratifying this custom of excessive force practiced in law enforcement, which includes, without limitation, the cases discussed herein and the following additional cases as samples:

---

[1] Joel Warner, *Police Misconduct: Denver ranks number one in terms of excessive force complaints*, Westword, Sept. 10, 2010, *available at*:
http://blogs.westword.com/latestword/2010/09/police_misconduct_denver_ranks_number_one_in_terms_of_excessive_force_complaints.php.
[2] Michael Roberts, *The City Council pays out to Timothy Thomason*, WESTWORD, Aug. 19, 2008, *available at* http://blogs.westword.com/latestword/2008/08/the_city_council_pays_out_to_t.php.

a.  Arising from conduct in 2004, Denver paid the family of Paul Child $1.32 million to settle a lawsuit brought after Mr. Childs, a developmentally disabled 15 year-old boy, was fatally shot by Denver Police Officer James Turney.

b.  Arising from conduct on February 25, 2004, Denver was sued relating to the death of Gregory Lee Smith, Jr., who was shot by Denver Police

c.  Arising from conduct on July 1, 2005, when Jeffrey R. Mayton alleged that Denver Police used excessive force against him in retaliation for his voicing medical needs after he was already arrested, causing significant injuries.

d.  Arising from conduct on August 5, 2005, when Quincy Michael Shannon alleged that Denver Police assaulted him with mace or pepper spray and other excessive force for no justifiable reason.

e.  Arising from conduct on November 21, 2005, when David Nettles alleged that Denver Police effectuated an unlawful arrest during which they used excessive force in that they punched him in the ribs, used nun chucks on his ankles, kicked him in the head and back and caused severe shoulder injury without justification.

f.  Arising from conduct on January 6, 2006, the estate of Frank Lobato alleged that Denver Police shot and killed Mr. Lobato who was sleeping in his bed and had done nothing to justify any force at all.

g.  Arising from conduct on April 3, 2006, Hirut Berhanmeskel alleged that Denver Police violently grabbed and twisted her arm behind her back, slammed her into the wall and broke her wrist without justification while she was trying to resolve a parking ticket dispute.

h.  Arising from conduct on August 11, 2006, Chandler Lyles alleged that Denver Police tackled and arrested him for no reason, breaking his clavicle.

i.  Arising from conduct on June 12, 2007, Ross Edwards Smith alleged that Denver Police punched him in the face, knocked him to the ground and beat him for no reason while he was peaceably protesting the Iraq war.

j.  Arising from conduct on June 27, 2007, Grace Arlene Mosley alleged that Denver Police unlawfully arrested her with excessive force causing pain.

k.  Arising from conduct in 2008, Denver paid $885,000 to settle a lawsuit brought in response to an incident in which Denver Police Officers used excessive force against Juan Vasquez, a 16 year-old boy. Mr. Vasquez was

30

severely injured with a lacerated liver and broken ribs after one of the officers used a fence as leverage to jump up and down on the boy's back while he lay prone on the pavement.[3]

l.   Arising from conduct in January 2009, Denver paid $100,000 to Trudy Trout to settle a lawsuit that arose out of Denver Police Officer use of excessive force after she alleged that Denver Police pushed her to the ground, breaking her wrist and lied about the mechanism of the injury.

m.   Arising from conduct on May 15, 2009, Altagracia Medina Valencia alleged that Denver Police tased her husband to cause him to drop a knife, but then shot and killed him in front of his family after he had dropped the weapon and without justification.

n.   Arising from conduct on October 16, 2009, Wayne C. Rose alleged that Denver Police knocked him to the ground while he was fleeing police, unarmed, and ran over him with a motorcycle, handcuffed him while unconscious and beat and kicked him repeatedly while unconscious.

o.   Arising from conduct on June 30, 2009, Denver settled a lawsuit related to the excessive force used on Michael DeHerrera. Although Officers Sparks and Murr were briefly terminated by the Manager of Safety based upon their excessive force and falsification of official reports, Denver decided to reinstate both of them to employment.

p.   Arising from conduct on June 30, 2009, Shawn Kyeone Johnson alleged that Denver Police joined in with a bouncer at a club and beat him without any justification.

q.   Arising from conduct on August 10, 2009, Danvis Smith alleged that Denver Police pulled him from his car, striking him and causing significant injuries to his arm, shoulder and back, without justification.

r.   In September 2009, Denver settled a wrongful death lawsuit for $225,000 to the family of Alberto Romero, who died after being repeatedly tasered and beaten with impact weapons by police when he was arrested wearing only boxer shorts. Before he died, Mr. Romero suffered eight broken ribs and had his tongue split open from the use of excessive force.

---

[3] David Packman, *Is There a Police Brutality Problem in Denver?*, INJUSTICE EVERYWHERE: THE NATIONAL POLICE MISCONDUCT STATISTICS AND REPORTING PROJECT, Sept. 6, 2010, http://www.injusticeeverywhere.com/?p=3028.

s.  In June 2010, Tyler Mustard filed a lawsuit alleging that Denver Police chased him, tackled him and beat him in the head, neck and body.

t.  In August 2010, Denver paid Chad Forte $22,500 to settle a lawsuit resulting from excessive force after he alleged that Denver Police jumped him causing injuries for jaywalking.

198.  Denver is aware of these and many other allegations of excessive force and, indeed, often has ultimately settled such cases for damages caused by such excessive force. These cases provide only representative examples of the rampant use of excessive force by Denver law enforcement officers and the lack of any training or supervision on the part of the City and County of Denver to prevent this dangerous and unconstitutional conduct.

## V.    CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
42 U.S.C. § 1983 – **Excessive Force in violation of the Fourth Amendment**
(Plaintiff against all Individual Defendants)

199.  Plaintiff hereby incorporates all of the forgoing paragraphs of this Complaint as if fully set forth herein.

200.  42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

201.  Plaintiff is a citizen of the United States and the individual police officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

202.  All individual law enforcement officer Defendants, at all times relevant hereto, were acting under the color of state law in their capacities as Denver law enforcement officers.

32

203.    At the time of the complained of events, Ryan Ronquillo had a clearly established constitutional right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force, including excessive deadly force.

204.    At the time of the complained of events, it was clearly established that law enforcement can not use deadly force against a fleeing suspect in a moving vehicle that does not pose an actual and imminent threat to the lives of any officers or civilians.

205.    Any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

206.    Under the totality of the circumstances, individual Defendants' actions were objectively unreasonable in light of the facts and circumstances confronting and/or known to them, violating the Fourth Amendment rights of Ryan Ronquillo to be free from excessive force.

207.    It was not objectively reasonable to assault Ryan Ronquillo, who was unarmed, suspected only of property crimes, was not attempting to evade arrest before or at the time of his unprovoked violent assault, and was in no way then posing any immediate or exigent threat to the physical safety of the officer or others as he was returning to the funeral for his friend.

208.    Under the totality of the circumstances, individual Defendants also unreasonably used deadly force against Mr. Ronquillo, resulting in his death.

209.    Mr. Ronquillo did not pose an actual and imminent threat to the lives of any officers or civilians present at the scene when they fired their fatal shots.

210.    These officers had no reason to believe that letting Mr. Ronquillo drive away at that time would pose a threat of serious physical harm to the officers of others.

211. These officers knew that the multiple rounds of bullets fired to Ryan Ronquillo's head and neck were certain to cause his death.

212. Further, within the meaning of clearly established law, the Defendants hereto all individually and jointly created any such "need for deadly force in this incident through their own reckless, deliberate conduct" that "was immediately connected to the firing officers" use of excessive deadly force. *See Pauly v. White,* 814 F.3d 1060 (10th Cir. 2016).

213. The Defendant officers "conduct prior to the suspect's threat of force" must be considered because, that "conduct is `immediately connected' to any suspect's threat of force." *See Allen v. Muskogee,* 119 F.3d 837, 840 (10th Cir. 1997).

214. This is because it "is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out." *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985).

215. Evidencing deliberate indifference in training and supervision in a recurring situation, multiple police officers carried out this arrest recklessly and with grossly excessive force, by *inter alia*, consciously deciding to effectuate this arrest of Ryan Ronquillo while he was still in his car outside a funeral home despite no exigent circumstances, not clearly identifying themselves as law enforcement, not giving Ryan Ronquillo any chance to peacefully surrender, violently assaulting him in his car, and positioning themselves recklessly around the vehicle while assaulting him, all contrary to well-established felony stop policies and practices.

216. At the time this unarmed 20-year-old was shot at some 11 times by Defendants Trujillo, White, Marshall, and DiManna, Ryan Ronquillo was reasonably exercising his clearly established right to self-defense by attempting to get away from his violent attacking assailants to preserve his life.

34

217.    The pre-shooting and the shooting actions of all of these officers may be fairly attributed to each of these jointly acting Defendants conduct, none of whom did anything to intervene to even attempt to prevent these events or assist thereafter, despite duty and opportunity.

218.    The complained of acts or omissions of individual Defendants were proximate causes of Mr. Ronquillo's death.

219.    The acts of omissions of these Defendants caused Mr. Ronquillo damages in that he suffered extreme physical and mental pain during the assault that resulted in his death.

220.    The acts or omissions of Defendants as described herein deprived Plaintiff of his constitutional rights and caused him other damages.

221.    As a proximate result of Defendants' unlawful conduct, Ryan Ronquillo's Estate has suffered actual physical and emotional injuries, and other damages and losses entitling him to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering at the time of death, emotional distress and hedonic damages to which his Estate is entitled to claim on his behalf, and for his loss of enjoyment of life and the value of his life and continuing familial relationships.

222.    Plaintiff Estate also has suffered lost future earnings, earnings capacity and related economic loss from Ryan Ronquillo's life being cut short at the age of 20.

223.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

35

224.    In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against each of these individual Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

225.    Because of their willful participation and actions in concert in this joint activity, each of these Defendants are liable to Plaintiff for all the proximately resulting injuries and damages complained of herein.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – Deliberately Indifferent Policies, Practices, Customs, Training, Supervision and Ratification in violation of the Fourth Amendment**
(Against City and County of Denver only)

226.    Plaintiff hereby incorporates all the forgoing paragraphs of this Complaint as if fully set forth herein.

227.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

228.    Plaintiff in this action is a citizen of the United States and Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

229.    The Defendants to this claim at all times relevant hereto were acting under the color of state law.

230.    Plaintiff had a clearly established right to be secure in his person from unreasonable seizure and death through excessive force under the Fourth Amendment.

231.    The acts or omissions of Defendants as described herein deprived Plaintiff of his constitutional right to life and to be free from excessive force.

232.    Defendant is not entitled to qualified immunity for the complained of conduct.

233.    Defendant City has maintained long-standing, department-wide policies and customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference with respect to excessive force by police officers generally, and including this obviously recurring problem faced by police of whether to shoot at drivers and other persons in moving vehicles in circumstances where the use of deadly force can not be reasonably justified by officers.

234.    At all times relevant hereto, the Defendant City maintained customs, habits, practices, and training exhibiting deliberate indifference to the constitutional rights of citizens to be free from excessive force, as partially described in the litany of excessive force cases referenced above, which were also moving forces behind Mr. Ronquillo's death.

235.    In light of the duties and responsibilities of those police officers that participate in arrests and covert operations, the need for specialized training and supervision is obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional and federal rights, that not providing such training and supervision was deliberately indifferent.

236.    Defendant City's deliberately indifferent training and supervision resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available, which were also moving forces in the unconstitutional deadly force by Defendant officers.

37

237.    Denver, through its authorized policymakers, including Police Chief White, approved of law enforcement's decisions and the basis for them, expressly ratifying all of their illegal decisions and even publicly covering up the assault and sequence of events.

238.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein, entitling him to compensatory and special damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, extraordinary pain and suffering at the time of death, emotional distress and hedonic damages to which his estate is entitled to claim on his behalf, including for his loss of enjoyment of life and the value of his life and continuing family relationships.

239.    Plaintiff Estate also has suffered lost future earnings, permanently impaired earnings capacity and related economic loss from Ryan Ronquillo's life being cut short at the age of 20.

240.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

## VI.    PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grant:

A.    Compensatory and consequential damages, including damages for physical injuries, loss of enjoyment of life, and other pain and suffering including hedonic damages, the value of a life and to continuing family relationships, lost future earnings and permanently impaired earnings capacity and other economic losses on all claims allowed by law in amounts to be determined at trial;

B.    Punitive damages on all federal claims allowed by law against individual Defendants in amounts to be determined at trial;

C.      Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, on all federal claims and state claims as allowed by law;

D.      Pre- and post-judgment interest at the lawful rate;

E.      Any further relief that this court deems just and proper, and any other appropriate relief at law or in equity.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

Respectfully submitted this 28th day of June. 2016.

> */s/John R. Holland*
> John R. Holland
> Erica T. Grossman
> Anna Holland Edwards
> Dan Weiss
> Holland, Holland Edwards & Grossman, PC
> 1437 High Street
> Denver, CO 80218